# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LECHELLE BROWN and BEATRICE TERRY, as guardian *ad litem* of LECHELLE BROWN and as administratrix of the ESTATE OF ROCHELLE TERRY, : : : : : | |
| Plaintiffs, : : | CIVIL ACTION |
| v. : : | |
| SCHOOL DISTRICT OF PHILADELPHIA, DR. RICHARD MANTELL, AKEEM WATSON, ANGELA PRESSLEY, TODD WADDY, JR., TODD WADDY, SR., KYSHAN TUNSTALL, NICOLE WALKER, AZEEZAH CHARLES in her own capacity and as parent/guardian of QUINZELL POWELL, a minor, and LISA FLETCHER in her own capacity and as parent/guardian of JEFFREY CHASE, a minor Defendants. : : : : : : : : : : : : | No. 08-2787 |

Norma L. Shapiro, J.                                                                                      July 28, 2010

## MEMORANDUM

Lechelle Brown was sexually assaulted by five fellow students at Frankford High School on June 15, 2006. Lechelle and her mother filed the instant action alleging a claim under 42 U.S.C. § 1983 for violations of Lechelle's rights under the Fourteenth Amendment to the United States Constitution and pendent state law claims. Before the court are two motions, both by Dr. Richard Mantell ("Dr. Mantell") and the School District of Philadelphia ("School District"): the Motion for Summary Judgment and supplemental Motion for Partial Summary Judgment, both on plaintiffs' Section 1983 claim. The court heard oral argument on May 26, 2010. For the reasons discussed below, the motions will be granted and judgment entered in favor of Dr. Mantell and the School District on Count I of plaintiffs' complaint.

I.   **FACTUAL BACKGROUND**

Lechelle Brown was born on February 4, 1990.  As a two-year old, Lechelle was diagnosed with mild mental retardation; she has also been diagnosed with Mixed Receptive-Expressive Language Disorder. Lechelle did not speak until the age of four. She has attended special-education classes under a School District Individualized Education Plan from elementary school through high school.  Evaluators have described Lechelle as someone with difficulty speaking, asking for help, and answering questions, and with significantly below average communications skills.

In the spring of 2006, Lechelle was sixteen years old and in tenth grade at Frankford High School.  During the spring semester, Lechelle's English teacher, Bonnie Torres, learned that a fellow special education student, T.B., made a sexual advance to Lechelle, and messed up her hair when she refused his advance.[1]  Plaintiffs allege that after this "T.B. incident," one-on-one supervision was promised Lechelle.[2]  Neither Ms. Torres nor Assistant Vice Principal Jeanine Hendricks recalls promising such supervision.  Lechelle was not provided with one-on-one supervision.

On June 15, 2006, Lechelle went to the cafeteria for lunch; she ate alone. There, a male student approached Lechelle, and convinced her to accompany him to an auditorium

---

[1]   Ms. Torres cannot recall from whom she learned the information, or any further detail; she did not personally witness the alleged incident. Torres Tr. 107-11.

[2]   Plaintiffs rely on the Affidavits of Yvette Carr and Margie Austin (exhibits 15 and 17, respectively, to Plaintiffs' First Response in Opposition to Summary Judgment) to establish that Lechelle's mother, Ms. Terry, told school officials about the T.B. incident and requested one-on-one supervision for Lechelle, and that school officials promised to provide supervision. The averments in both affidavits are identical. Ms. Terry's statements, as recounted by Ms. Carr and Ms. Austin in their affidavits, are hearsay.  Plaintiffs assert that the court may consider such testimony because any hearsay statements would be admissible at trial under Federal Rules of Evidence 803(3) or 807.  Ms. Terry's statements regarding her own actions are not statements of intent but rather statements of what she did, and are offered to prove the truth of the matter asserted: that Ms. Terry informed school officials of the T.B. incident and requested one-on-one supervision for Lechelle.  The affidavits also present Ms. Terry's statement that school officials promised to provide such supervision, constituting hearsay-within-hearsay, and offer it for the truth of the matter asserted.  Ms. Terry's hearsay statements are incurable, even under the residual exception of 807, because there is no indicia of reliability of the out of court statements to Ms. Carr or Ms. Austin.  But even if school officials affirmatively promised to provide constant, one-on-one supervision for Lechelle, and then failed to provide such supervision, it is immaterial in light of clear precedent holding that a state created danger claim premised on school officials' failure to act is deficient as a matter of law.

balcony on the second floor of the school. In the balcony area, five Frankford students sexually assaulted her: Quinzal Powell; Akeem Watson; Kyshan Tunstall; Jeffery Chase and Todd Waddy, Jr. The assault ended when a teacher, investigating a large group of students in an area where they should not have been, approached the balcony. As the teacher approached, one of Lechelle's assailants shouted, "teacher coming," and the group fled. A psychologist hired by the Philadelphia District Attorney's Office determined that Lechelle Brown was not capable of providing legal consent to sexual relations because of her cognitive disabilities.

Students were not permitted in the balcony where the assault occurred unless there was an authorized school function in the auditorium; the doors to the balcony generally were locked. Nevertheless, students could and did manipulate the doors to gain entry to the balcony without permission. Frankford principal Dr. Mantell and other school officials were aware of the condition prior to Lechelle's assault. Dr. Mantell recognized this was a problem because of the unsupervised nature of the balcony area, and testified that "if one were of the mind to do criminal activity, that might be an attractive place to them because the room was maybe used three or four time[s] as [sic] year."[3]

Frankford High School has been identified as a "persistently dangerous school" under the No Child Left Behind Act since the law was enacted, with the exception of one year. To be identified as persistently dangerous, each year Frankford must have had twenty or more dangerous incidents, *i.e.*: weapons possession; incidents resulting in arrest; homicide; kidnapping; robbery; sexual offenses; and aggravated assaults. The School District has a Student Code of Conduct applicable at each district school, including Frankford. The Code of Conduct classifies several violations as "Level 2," such as sexual assaults and weapons offenses. The prescribed punishment for a Level 2 offense is expulsion or transfer. Jack Stollsteimer, School Safety Advocate for the Commonwealth of Pennsylvania, testified that the School District under-reported violent incidents in the

---

[3]  Mantell Dep. 272:4-7.

period leading up to the 2006-2007 school year.[4] Mr. Stollsteimer also testified that the School District had a policy not to expel students, even if they had committed a Level 2 offense.[5]

## II. PROCEDURAL BACKGROUND

On June 16, 2008, Lechelle and her mother, Rochelle Terry, filed a complaint alleging a claim under 42 U.S.C. § 1983 against Dr. Mantell and the School District, and claims under Pennsylvania law for constitutional violations, negligence, intentional and negligent infliction of emotional distress, assault and battery against Dr. Mantell, the School District, the student perpetrators and their parents and natural guardians. Default has been entered against all the student and parent defendants except Azeezah Charles. *See docket entries* on October 21, 2008; paper no. 25. By Order dated December 8, 2008, all state law claims were severed and stayed. On February 16, 2009, Lechelle's mother died; her grandmother, Beatrice Terry, was appointed as guardian *ad litem* (paper no. 48).

In deciding the first motion for summary judgment, the court determined there was a serious question as to Lechelle's competency to testify; the court appointed Dr. Eileen Bazelon to conduct a psychiatric evaluation followed by a report and recommendation. Dr. Bazelon found that, when asked a confusing question or one requiring elaboration, Lechelle often would not respond at all; the interlocutor must phrase questions to elicit yes-or-no answers or abandon the subject. According to Dr. Bazelon, previous examiners, dating back to 1994, observed the same condition. Dr. Bazelon concluded that it was impossible to determine whether Lechelle did not understand questions, was guarded in her responses, understood but could not express her thoughts, or some combination of the three. In addition, Lechelle has become even more withdrawn and uncommunicative since her mother's death. Dr. Bazelon concluded that Lechelle was not competent to testify and neither she nor her grandmother wished her to testify.

---

[4] Stollsteimer Dep. 89:8-14.

[5] Stollsteimer Dep. 102-04.

In light of Dr. Bazelon's report and recommendation; discussions during an April 6, 2010 conference with counsel, and the court's finding that testimony by Lechelle could only be elicited by the most leading of leading questions, the court ordered that testimony and statements by Lechelle would not be considered by the court on the motion for summary judgment or by the fact-finder at trial. The court permitted the parties to file a supplemental motion for summary judgment and response in light of the decision. Defendants' motion for summary judgment and supplemental motion on plaintiffs' Section 1983 claim are before the court.

Dr. Mantell and the School District have also moved to exclude the testimony of plaintiffs' expert Peter Blauvelt, and have objected to many of the exhibits submitted in support of plaintiffs' responses to the motions for summary judgment. At the hearing on April 6, 2010, this court excluded Mr. Blauvelt's conclusions regarding: (1) causation of Lechelle's attack; (2) the effect on the student defendants of the School District's failure to expel or transfer those who violate the Student Code of Conduct; (3) what might have occurred if Dr. Mantell or the School District had acted in accordance with zero tolerance policies; (4) the defendants' states of mind; and (5) legal conclusions. In addition, the court has excluded the Reports of the Office of School Safety Advocate. For purposes of oral argument and disposition of the motions for summary judgment, the court assumes without deciding that all other challenged evidence would be admissible.

### III.  LEGAL STANDARD

When a party files a motion for summary judgment, "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In making a summary judgment determination, all inferences must be viewed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When the non-moving party is the plaintiff, she must "make a showing sufficient to

establish the existence of [every] element essential to [her] case,"as she will bear the burden of proof on each element of her claims at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In order to survive a motion for summary judgment, the non-moving party cannot rely solely on the unsupported allegations found in the pleadings. *Id*. at 324. Instead, the non-moving party must raise more than "some metaphysical doubt" as to a material fact. *Matsushita*, 475 U.S. at 586. In making a decision as to whether there is a "genuine" issue of fact, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

IV. **DISCUSSION**

Section 1983 provides, in part, that:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of a State or Territory . . . subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . .

Section 1983 does not create substantive rights; it provides a remedy for violations of rights established elsewhere. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985); *Kniepp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

For personal liability under Section 1983, a plaintiff must show that a person acting under color of state law caused a deprivation of a right secured by the Constitution. *See Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995).

For municipal liability, a plaintiff must establish that an official policy or custom served as a proximate cause of the asserted constitutional deprivation. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990). Official policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict. *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990). A custom or practice

may consist of a course of conduct so permanent and widespread that it has the force of law. *Id.* To establish municipal liability based upon a custom or practice, the plaintiff must demonstrate that the decision-maker had notice that a constitutional violation could occur and that the decision-maker acted with deliberate indifference to this risk. *Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000).

### A. The Fourteenth Amendment Due Process Right to Bodily Integrity

Plaintiffs allege that Dr. Mantell and the School District deprived Lechelle of her due process right to bodily integrity, a liberty interest. The Due Process Clause of the Fourteenth Amendment provides that "[n]o State . . . shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 2. This clause

> is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

*DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 195 (1989).

In *DeShaney*, four year old Joshua DeShaney was brutally and repeatedly beaten by his father. County social workers were aware of the abuse, took some steps to intervene, but decided not to remove Joshua from his father's custody. After suffering permanent brain damage as a result of the abuse, Joshua and his mother brought a Section 1983 action alleging that county social workers "deprived Joshua of his liberty without due process of law . . . by failing to intervene to protect him against a risk of violence at his father's hands of which they knew or should have known." *DeShaney*, 489 U.S. at 193.

The Supreme Court rejected the substantive due process claim, explaining that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.* at 195. The

7

Court reasoned that, "[i]f the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them." *Id*. at 196-97.

There are two exceptions to *DeShaney*'s ruling that the state owes no duty of protection to its citizens. First, the state has a duty to protect or care for individuals when the state takes control of an individual so that a "special relationship" exists. *See, e.g., Youngberg v. Romeo*, 457 U.S. 307 (1982) (state has duty to ensure safety of involuntarily-committed mental patients); *Estelle v. Gamble*, 429 U.S. 97 (1976) (state has duty to provide medical care to inmates). In *D.R. v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364 (3d Cir. 1992), our Court of Appeals held that no special relationship exists between school children and the state. This exception is therefore inapplicable.

Second, the state has a duty under a state created danger exception when it "acts in a way that makes a person substantially more vulnerable to injury from another source than he or she would have been in the absence of the state intervention." *Schieber v. City of Philadelphia*, 320 F.3d 409, 416 (3d Cir. 2003) (no state created danger claim where police officers decided not to make a forced entry and advised neighbors to do nothing but call 911 if they heard further noise from an apartment where the occupant was later found to have been raped and murdered); *see Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 907 (3d Cir. 1997) (no state created danger claim where a teacher was killed in a classroom by a mentally ill person who gained entry through an impermissibly unlocked door because the likelihood of the deadly attack was not a foreseeable risk).[6] Lechelle's federal claim is based on this second exception.

---

[6] Our Court of Appeals first recognized a state created danger theory in *Kniepp v. Tedder*, 95 F.3d 1199, 1211 (3d Cir. 1996); however, the test articulated in that case has been substantially altered by subsequent decisions of the Supreme Court and our Court of Appeals. Following the Supreme Court's decision in *County of Sacramento v. Lewis*, 523 U.S. 833, 845-47 (1998), a state actor will be liable only for conduct that "shocks the conscience"; it is no longer enough that she or he has acted in "willful disregard" of the plaintiff's safety. Post-*Lewis*, our Court of Appeals formulated the state created danger standard in *Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006), and *Sanford v. Stiles*, 456 F.3d 298, 304-05 (3d Cir. 2006).

8

B. **State Created Danger**

The substantive due process right to be free from state created danger stems from the Supreme Court's opinion in *DeShaney*. In determining whether the state could be held liable for failing to protect Joshua from his abusive father, the Court found important that "while the state may have been aware . . . of the dangers . . . it played no part in their creation, nor did it do anything to render [plaintiff] any more vulnerable to them." 489 U.S. at 201. Our Court of Appeals has interpreted *DeShaney* to mean that a "state may be liable for constitutionally protected rights, even in the absence of a special relationship with an individual, when the state, through its affirmative conduct, creates or enhances a danger for the individual." *Brown v. Pennsylvania Dep't of Health Emergency Medical Servs. Training Inst.*, 318 F.3d 473, 478 (3d Cir. 2003).

The four elements of a state-created danger claim are:

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actors acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions . . . ; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Sanford v. Stiles*, 456 F.3d 298, 304-05 (3d Cir. 2006) (holding that plaintiff's state-created danger claim failed because plaintiff was unable to show at least two of the four required elements). All four elements must be satisfied to state a claim. *Id.*

C. **The Affirmative Act Element**

Plaintiff must show that "a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." *Sanford*, 456 F.3d at 305-05. Liability accrues under a state-created danger theory "upon the states' *affirmative acts* which work to the

9

plaintiffs' detriments in terms of exposure to danger." *Bright v. Westmoreland County*, 443 F.3d 276, 282 (3d Cir. 2006) (emphasis in original).

Distinguishing between an affirmative act and failure to act is not easy:

> We do not want to pretend that the line between action and inaction, between inflicting and failing to prevent the infliction of harm, is clearer than it is. If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit.

*D.R.*, 972 F.3d at 1374.

As our Court of Appeals has recognized many times, mere failure to protect an individual does not violate the Due Process Clause. *DeShaney*, 489 U.S. at 197. For example, in *Kaucher v. County of Bucks*, 455 F.3d 418 (3d Cir. 2006), the Court of Appeals stated that petitioners must allege affirmative acts that were the "but for cause" of the risks they faced because a failure to act cannot form the basis of a valid Section 1983 claim. *See id.* at 433 n.10; *see also Bright*, 443 F.3d at 283-84 (no state created danger claim for failure to hold revocation hearing for an individual in violation of his parole prior to killing an eight-year-old girl); *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 907-08 (3d Cir. 1997) (no state created danger claim for failure to prevent mentally disturbed individual from entering school and attacking teacher); *D.R.*, 972 F.2d at 1376 (no state created danger claim for failure of school officials to investigate and stop instances of sexual abuse of students) (*en banc*); *Brown v. Grabowski*, 922 F.2d 1097 (3d Cir. 1990) (no state created danger claim for failure to file criminal charges against an individual who repeatedly threatened and assaulted former girlfriend, despite reports to the police by the victim and her family).

In *Bright v. Westmoreland County*, 443 F.3d 276, 284 (3d Cir. 2006), the Court of Appeals addressed a claim brought on behalf of eight year old Annette Bright, who was murdered by a man released on parole for an earlier sex offense involving her older sister. The offender repeatedly violated his parole by attempting to contact Annette's sister. A

police officer assured the girls' father that the offender's parole would be revoked and he would be arrested. Before a revocation hearing was held, the offender murdered Annette. 443 F.3d at 278-79.

Annette's father, on her behalf, asserted that the police caused her death by: (1) delaying the revocation of parole; (2) assuring the family that they would protect Annette; and (3) not following up on a confrontation with the perpetrator prior to Annette's murder, thereby "embolden[ing] him to commit a crime he otherwise would not have committed." *Id.* at 283.

The Court of Appeals rejected these claims on the grounds that:

> The reality of the situation . . . is that what is alleged to have created a danger was the failure of the defendants to utilize their state authority, not their utilization of it. [Plaintiff] has identified no action of the defendants that utilized their state authority in a manner that rendered Annette more vulnerable . . . than she would otherwise have been.

*Id.* at 284.

Even a state officer's actual knowledge of danger to the victim does not create an affirmative duty to protect the victim from that harm. Rather, our Court of Appeals has concluded that *DeShaney* clearly holds that "no affirmative duty to protect arises from the State's knowledge of the individual's predicament." *Bennett v. Philadelphia*, 499 F.3d 281, 288 (3d Cir. 2007); *see also Bright*, 443 F.3d at 284. An assurance by the state that it will act to protect an individual, coupled with a failure to do so, is not a state created danger. *See Ye v. United States*, 484 F.3d 634, 640 (3d Cir. 2007) ("mere assurance cannot form the basis of a state-created danger claim" where publicly employed doctor wrongly assured patient that there was nothing to worry about and that he was fine); *see also Bright*, 443 F.3d at 284.

### 1. Alleged Wrongdoing by Dr. Mantell

Plaintiffs contend that Dr. Mantell knew that Lechelle was incapable of protecting herself, and that she had previously been sexually propositioned at school when unattended. Plaintiffs argue that the promise and failure to provide one-on-one supervision

11

for Lechelle after the T.B. incident were affirmative acts depriving Lechelle of other, outside sources of protection and increasing the likelihood of harm. Plaintiffs also argue that Dr. Mantell knew of and refused to correct a known safety hazard (the door to the auditorium balcony), and that Dr. Mantell refused to report or properly discipline students who violated the Student Code of Conduct.

Dr. Mantell has asserted that he is entitled to qualified immunity. Qualified immunity shields state officials from suit when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Burella v. City of Philadelphia*, 501 F.3d 134, 139 (3d Cir. 2007). Determining whether a state actor is entitled to the affirmative defense of qualified immunity involves two inquiries: (1) whether the facts alleged show that a state actor violated a constitutional right; and (2) whether the constitutional right is clearly established so that a reasonable person would know that the conduct was unlawful. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Bayer v. Monroe County Children & Youth Servs.*, 577 F.3d 186, 191 (3d Cir. 2009). Courts are accorded "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, U.S. , 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009).

Plaintiffs' attempts to characterize the alleged wrongdoing as affirmative acts of state authority are not persuasive. It is clear that what they actually contend is that Dr. Mantell failed to act at all. *See* Plaintiffs' Response in Opposition to Summary Judgment, paper no. 79 at 29 ("leaving Lechelle unsupervised;" "abandoning Lechelle;" "ignoring and refusing to correct . . . dangers;" "refusing to properly discipline;" and "refusing to expel or transfer.") There is no question that this argument is deficient as a matter of law. *See Ye*, 484 F.3d at 638 ("[B]oth *DeShaney* and [Third Circuit] precedents explicitly require[] an affirmative act, rather than inaction."). A state's failure to detain a violent actor does not constitute an affirmative act under the state created danger theory, even when state officials give false assurances that they will protect an individual.

12

Because plaintiffs cannot establish a constitutional violation, the court need not move beyond this threshold question of the qualified-immunity analysis. *See Saucier*, 533 U.S. at 201; *Ye*, 484 F.3d at 643 n.6 ("As there was no constitutional tort, we need not reach the question of whether the law was clearly established . . . ."). Dr. Mantell is qualifiedly immune and partial summary judgment will be entered in his favor on Count I, the Section 1983 claim.

### 2. Alleged Wrongdoing by the School District

Plaintiffs contend that the School District is liable for the alleged deprivation of Lechelle's Fourteenth Amendment rights, because the School District engaged in policies, practices and customs of under-reporting school violence and crime, and refusing to discipline, transfer or expel students who commit such acts. They rely on *Stoneking v. Bradford Area School District*, 882 F.2d 720 (3d Cir. 1989), and *Doe v. Allentown School District*, No. 06-1926, 2007 U.S. Dist. LEXIS 70355 (E.D. Pa. Sept. 24, 2007), to establish that "an active and concerted effort to conceal crimes" satisfies the affirmative act requirement of the state created danger doctrine. They rely on the testimony of School Safety Advocate Stollsteimer to establish that the School District under-reported violent acts and refused to expel students who committed violent acts, and argue that these polices emboldened student perpetrators to commit violations, and proximately caused the injury to Lechelle.

Our Court of Appeals has rejected the idea that, simply by allowing violent private actors to persist in their illegal or immoral behavior, a municipal or state agency emboldens and encourages the violence in violation of an individual's Due Process rights. *Bright*, 443 F.3d at 283-85. The School District's failure or refusal to discipline, transfer or expel student violators is not a state created danger.

In *Stoneking*, our Court of Appeals, holding a school district's efforts to conceal sexual abuse actionable, found dispositive that the offender was a state actor. The principal and assistant principal of a high school followed a practice of "reckless indifference to instances of known or suspected sexual abuse of students by teachers." 882 F.2d at 724-25. By

13

concealing complaints of previous abuse, discouraging such complaints, failing to investigate such complaints, and requiring complainants to apologize to the accused teachers, these school officials "created a climate which, at a minimum, facilitated sexual abuse of students by teachers." 882 F.2d at 725. The Court of Appeals distinguished *DeShaney* because there the underlying injury was caused by a private actor; in *Stoneking* the underlying harm was caused by a state actor. The court held, "Nothing in *DeShaney* suggests that state officials may escape liability arising from their policies maintained in deliberate indifference to actions taken *by their subordinates*." *Stoneking*, 882 F.2d 724-25 (emphasis added). The court concluded that because the underlying harm was caused by the school's band director, a state actor, Stoneking stated a viable claim for liability under Section 1983. *Id.* at 725.

Subsequently, in *D.R. v. Middle Bucks Area Vocational Technical School*, the Court of Appeals, distinguishing *Stoneking*, dismissed Section 1983 claims brought by high school students who claimed they were molested by other students. 972 F.2d at 1376. The court held that the plaintiffs failed to state a claim because, as here, "private actors committed the underlying violative acts." *Id*. The court concluded that sexual molestation by a state agent was readily distinguishable from molestation by fellow students because the Due Process Clause imposes limitations on the state's conduct. *Id.* Here, because private actors committed the underlying violative acts, *Stoneking* is not precedential.

Plaintiffs' reliance on *Doe v. Allentown School District* is also unavailing. There, the district court concluded on a motion to dismiss that "the allegations concerning concealment of the assaults [by a fellow student] *might* result in liability for the defendants. . . . an active and concerted effort by defendants to conceal crimes against the victims at [Central Elementary School] *could* constitute an affirmative act for purposes of the state created danger theory." 2007 U.S. Dist. LEXIS 70355, *18 (emphasis added). The court explained that it had not determined whether the defendants did cover up abuse, or whether the actions alleged prevented help from reaching the plaintiffs; the court determined only that plaintiffs were entitled to discovery. *Id.* at *20.

14

In *Stoneking* and *Doe v. Allentown School District*, school officials were alleged to have concealed instances of abuse by the specific offenders responsible for abusing the plaintiffs. Here, none of the students who assaulted Lechelle had a record of previous sexual assaults. Plaintiffs point only to general under-reporting of all categories of Code of Conduct violations. In light of the Court of Appeals' decision in *D.R.*, plaintiffs' reliance on *Doe* is unpersuasive, and summary judgment will be entered in favor of the School District on Count I, plaintiffs' Section 1983 claim.

## V.      CONCLUSION

As in *Bright*, plaintiffs cannot show Dr. Mantell or the School District did more than fail to act to prevent injuries caused by private actors. That failure and the actions of Lechelle's fellow students, while tragic, do not give rise to a cognizable state created danger claim as a matter of law.

Summary judgment will be entered in favor of Dr. Mantell and the School District on Count I of plaintiffs' Complaint. An appropriate order will follow.